LabamoRE, Judge,
delivered the opinion of the court:
This action is brought by plaintiff seeking to recover active duty pay and allowances from December 8,1951, when he was actually discharged, through December 31, 1951, when, he alleges, he should have been placed on the temporary disability retired list, and for disability retired pay from January 1, 1952, to date of judgment. He alleges he became *439 unfit for duty while serving on extended active duty. He further alleges that the actions of the Second Physical Evaluation Board and the Physical Keview Council were arbitrary, capricious, contrary to the weight of the evidencé, and hence unlawful.
The facts of the case show that plaintiff was enrolled in the Naval Reserve Force on November 21,1917, in the rating of Yeoman, second class, and thereafter served on active duty until December 3, 1918, when he was released from active service pursuant to his own request. He was honorably discharged upon the expiration of his enlistment on November 20, 1921.
After this period of service, the facts show that plaintiff completed several tours of active duty in the U.S. Navy, as a member of the Naval Reserve. He was given a physical examination and found to be in each instance physically qualified for active duty. In each instance he was found physically qualified for release from active duty. His blood pressure readings were as follows:
Systolic Diastolic
Aug. 4, 1947_ 160 80
Nov. 3,1948_ 145 95
June 29,1949_ 148 98
Feb. 26, 1951_ 138 76 (sitting)
Do- 140 72 (standing)
On July 3,1947, plaintiff was physically examined at the U.S. Naval Air Station in New York to determine his eligibility for re-enlistment in the Naval Reserve. The report of physical examination summarized the defects as follows: “Defective vision — Overwt—Unstable blood pressure— History of Medical Surveyplaintiff’s blood pressure having been recorded as varying “from 145/92 to 190/130.”
With respect to plaintiff’s physical examination on July 3, 1947, the evidence clearly shows that the blood pressure reading of 190 systolic and 130 diastolic was in error. The evidence shows that at the time the medical officer in charge told plaintiff he had high blood pressure, i.e., 190/130, no blood pressure reading had been taken. Plaintiff objected and no medical corpsman on duty admitted to having taken his blood pressure. Accordingly, his blood pressure was then taken and found to be 140 systolic and 92 diastolic. We know, not *440 only from the evidence in this case, but from human experience, that two such varied readings could not occur in such a short space of time, and we therefore conclude that the high reading of 190/130 was in error. This high reading, however, was recorded and remains on plaintiff’s physical examination records.
Notwithstanding plaintiff’s July 3, 1947, report, he was examined later on four different occasions with blood pressure readings as previously shown in this opinion.
After plaintiff’s February 26, 1951, physical examination, he reported to active duty on March 12, 1951, and was honorably discharged on December 7, 1951, by reason of physical disability.
From March 12,1951, to August 7,1951, plaintiff’s tour of duty consisted of the following:
(a) March 12-March 22: at home awaiting notification of assignment.
(b) March 22-April 1: standing gangway watches at the Brooklyn Naval Beceiving Station examining incoming and outgoing packages.
(c) April 3-April 10: aboard a Patrol Craft Escort Bescue Boat (a boat about the size of a tugboat) docked at Portsmouth, New Hampshire.
(d) April 11-April 17: at sea aboard the Patrol Bes-cue boat on a training cruise from Portsmouth, New Hampshire to Norfolk, Virginia and return to Portsmouth; during this short tour of sea duty, plaintiff stood bridge watches and did some painting.
(e) April 18-August 7: Brooklyn Beceiving Station where plaintiff performed light shore duty.
Upon the expiration of plaintiff’s enlistment on August 7, 1951, he was given a physical examination which resulted in a diagnosis of “hypertensive cardiovascular disease, benign.” Plaintiff was thereupon transferred to St. Albans Naval Hospital for disposition and evaluation.
On September 10, 1951, a clinical board convened at St. Albans Naval Hospital found that:
* # ‡
This patient, in summary has benign essential arterial hypertension with hypertensive cardiovascular disease (left heart strain and early congestive failure) associated with benign nephrosclerosis.
*441 The present diagnosis is Hypertensive Cardiovascular Disease, Benign, #4930.
The Board recommended that plaintiff appear before a physical evaluation board.
On September 10, 1951, a clinical board convened at St. Albans Hospital recommended as follows:
(1) That Thomas Francis Hendrick, BMGC, V-6, XJSNR, #172 00 12, be found unfit to perform the duties of his rate by reason of physical disability incurred while entitled to receive basic pay by reason of:
(2) diagnosis: Hypertensive Cardiovascular Disease, Benign; that
(3) his disability is not due to intentional misconduct or wilful neglect and was not incurred during a period of unauthorized absence; that
(4) his disability is considered to be the proximate result of the performance of active duty; that
(5) his disability is considered to be thirty (30%) per centum in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration, Code Numbers 7099; 7007 (Hypertensive Heart Disease); and that
(6) accepted medical principles indicate that his disability may be of a permanent nature.
The board advised the above-named individual that the recommended findings of the board did not indicate what the final determination of the Secretary of the Navy would be and that they were communicated to him only for the purpose of filing a rebuttal if he so desired.
The above-named individual was then discharged from further attendance before the board.
Plaintiff filed a statement of rebuttal to the findings of the Physical Evaluation Board stating that he was not in agreement with the 30 percent recommended disability rating.
Upon review, the Physical Review Council, Department of the Navy, concurred in the findings except so much thereof as found that the disability occurred while plaintiff was in receipt of basic pay, and was the proximate result of the performance of active duty. The Council under date of October 10, 1951, advised the Physical Evaluation Board as follows:
*442 1. The members of the Physical Eeview Council concur in the recommended findings of the Physical Evaluation Board with the exception of that part of finding (1) which states that the subject member’s disability was incurred in receipt of basic pay, and finding (4).
2. The past medical records in this case indicate that the member first presented abnormal blood pressure readings in 1947 as indicated, on the report of physical examination, Form Y, submitted on 3 July 1947 incident to reenlistment in V-6, U.S. Naval Eeserve. The history of illness as given by the patient at that time states that he believes that a mild. hypertension was mentioned in connection with an earlier Medical Survey on 18 January 1945. His blood pressure readings reported in the 1947 Form Y are stated to have ranged from 145/92 to 190/130. A gain in the physical examination report dated 3 November 1948 the blood pressure was found to be 145/95 and 148/95. The physical examination report (Standard Form 88) dated 29 June 1949 and submitted on release to inactive duty shows the blood pressure to have been 148/94 and 148/96.
3. The Physical Eeview Council is of the opinion that these facts refute the contention made by Hendrick in his statement before the Physical Evaluation Board that all diseases or disabilities that he now has have occurred between 12 March 1951 and 7 August 1951. It is noted that the member now presents persistent hypertension with a grade two hypertensive retinopathy, electrocardiogram indicative of left heart strain, evidence of early cardiac failure and benign nephrosclerosis. These are considered to reflect normal progression over a period dating at least from 1947 when he showed an elevation as high as 190/130, rather than changes developing over a five month period, as the member contends and the Physical Evaluation Board confirms in its present findings.
4. In view of the above the enclosure is returned in accordance with the provisions of reference (a) for reconsideration and resubmission.
The Physical Evaluation Board reconvened on October 18, 1951, to reconsider its original recommended findings. The Board consisted of three commissioned officers, two of whom had been members of the initial Physical Evaluation Board that considered plaintiff’s case on September 18, 1951, including the former medical member. A new non-medical member was present in lieu of one of the former non-medical *443 members. Plaintiff appeared with counsel and the Board reviewed the entire record, including a statement of Dr. Bernard Miller, dated October 16, 1951, wherein he stated as follows:
This is to certify that Thomas F. Hendrick of 6735 Bidge Blvd. Bklyn, N.Y., was examined by me on 3 July 1947 at my office. He stated that he had been examined on this date, 3 July 1947 at Floyd Bennett Field, Bklyn, N.Y. for the purpose of enlisting in the Naval Beserve.
Blood pressure determinations on 3 July 1947 were: Bight arm 142/88, left arm 146/90.
With the new member dissenting, the Physical Evaluation Board found plaintiff to be unfit by reason of physical disability incurred while not entitled to basic pay and not a result of the performance of active duty.
The Physical Beview Council concurred in the recommended findings of the majority decision of the Physical Evaluation Board, and on November 6, 1951, the Secretary of the Navy approved and directed plaintiff’s discharge from the naval service by reason of physical disability. Plaintiff was accordingly discharged for physical disability.
Pursuant to plaintiff’s application filed with the Board for Correction of Naval Becords, the Bureau of Medicine and Surgery was requested to furnish the Board an advisory opinion.
Under date of July 28, 1955, the Bureau advised the Correction Board as follows:
2. A review of the medical record indicates that when Hendrick was examined on 3 July 1947, his blood pressure was reported to be 190-142 systolic and 130-92 diastolic. On 4 August 1947, it was again reported that his blood pressure was in the hyptertensive range with a reading of 160/90. On 3 November 1948, and again on 29 June 1929 [sic] it was reported that his blood pressure was in the hypertensive range. On the former date his systolic was 145, diastolic 95; and on the latter date, systolic 148 and diastolic 96.
3. Based upon the foregoing, there appears to be little doubt that Hendrick was suffering from arterial hypertension prior to his assignment to extended active naval service on 12 March 1951. After careful review of his record, it would be entirely proper, medically, to consider that the hypertensive cardiovascular *444 changes which he showed on 7 December 1951, the date he was discharged from the Naval Reserve, were due to the natural progress of the hypertensive vascular disease present prior to assignment to active duty. In view of the foregoing therefore, the determination of the Secretary of the Navy that Hendrick’s disability was not incurred while entitled to receive basic pay appears to have been in accord with the evidence of record and sound medical judgment.
On October 17, 1955, the Correction Board held a formal hearing with plaintiff and counsel in attendance. The Board found no change or correction of plaintiff’s records were warranted. This decision was approved by the Secretary of the Navy.
As a result of plaintiff’s request for reconsideration, a further review of the matter was held with resulting advice by the Board to the Secretary of the Navy that plaintiff’s disability had its inception in 1945 and there was no basis for relief. The Secretary of the Navy approved the Board’s final decision.
The questions before this court are (1) whether the actions of the reconvened Physical Evaluation Board and the Physical Review Council in recommending and the Secretary of the Navy in determining that plaintiff’s physical disability was not incurred while he was entitled to basic pay and was not the proximate result of the performance of active duty, were arbitrary, capricious and contrary to the evidence, and (2) whether plaintiff’s physical disability was incurred in, or aggravated by, naval service while on extended active duty so as to entitle plaintiff to basic pay.
Plaintiff’s entitlement to retired pay depends entirely upon whether his disability was incurred on active duty.
While this court has many times said it could not determine who was fit or unfit for duty, there is no question here regarding plaintiff’s physical disability.
This court also has many times said if the decision of the various boards and the Secretary of the Navy were not clearly arbitrary or unsupported by substantial evidence, it would not disturb said findings.
What we have here is, we deem, a unique situation. Plaintiff had always been found physically fit for active duty *445 except on December 6, 1944, when he was found unfit by-reason of an ankle injury. This injury apparently was repaired inasmuch as it was never mentioned in any of his later physical examination reports. At no time was his physical condition questioned until at and after his July 3, 1947, examination, when he was erroneously determined to have a blood pressure of 190/130. This erroneous reading was permitted to remain on plaintiff’s record, and from that time on he seems to have been continuously plagued thereby in spite of his continued objection to the referral to said reading.
The Physical Eeview Council led off with the assumption that plaintiff’s past medical records indicated abnormal blood pressure readings in 1947 as indicated by the July 3, 1947, report. The Council then specifically referred to the recorded reading of 190/130, and the reconvened Physical Evaluation Board while it had before it the original findings, followed the advice of the Physical Eeview Council.
The Board for the Correction of Naval Eecords referred plaintiff’s case to the Bureau of Medicine and Surgery for advice in the matter. The Bureau then likewise advised the Correction Board that plaintiff had a history of hypertension and specifically referred to the erroneous July 3, 1947, reading.
Thus all through the entire proceedings the first analysis of plaintiff was that he suffered from hypertension as a result of high blood pressure and each finding was premised on the July 3, 1947, reading.
This court, of course, cannot and does not attempt to substitute its judgment for that of the doctors. Nor in the case of a conflict, can we reconcile the conflict and say who is correct and who is incorrect.
Here we encounter the feature of this case referred to as “unique.” The uncontroverted evidence shows that a person of plaintiff’s age should have a normal blood pressure of systolic 129 to 137 with high normal of 161, and diastolic reading from 81 to 84 with high normal of 98. The uncon-troverted evidence also discloses that plaintiff’s disability was directly connected with and directly resulting from the condition of his arteries which is reflected by his blood pres *446 sure. The evidence further shows that the first and only-recorded blood pressure beyond the high normal range was when plaintiff became ill after his last tour of active duty. Whether the rigors of duty caused this condition we cannot say in spite of the fact that there is conflicting evidence on this point. We do say, however, the proposition seems strange that a person declared physically fit a few weeks previously and suddenly, after a strenuous tour of duty, became ill and then to have a finding that said illness was neither conceived nor aggravated by such service. Cf. Register v. United States, 131 Ct. Cl. 98. As a matter of fact, there is a strong presumption that the disability had its origin in line of duty. Moore v. United States, 48 Ct. Cl. 110.
It seems to the court that the conclusion that his disability predated his active service was at least a borderline case, and it also seems inescapable that the various boards were influenced to some degree by the inclusion in his medical records of an erroneous blood pressure reading. This despite the unbroken record of normal or at most high normal blood pressure readings.
We are of the opinion that to fairly determine the question it would have been correct and just for the Board for the Correction of Naval Records to order the erroneous reading expunged from his record and then refer his case to a medical board for advice which, in our opinion, is one of the reasons for the establishment of said Correction Board. This was not done and plaintiff bases no claim on arbitrary action of the Correction Board. Instead, plaintiff says his cause of action accrued by reason of the action of the Physical Evaluation Board and the Physical Review Council.
Therefore, when the Physical Evaluation Board and the Physical Review Council based its conclusions at least in part on the mistake in recorded blood pressure, we think it was in law arbitrary. Consequently, plaintiff is entitled to recover retirement pay under section 402(a) of the Career Compensation Act of 1949,63 Stat. 802, 807, for the period commencing January 1, 1952, to date of judgment, less any amounts of compensation received from the Veterans Administration, and judgment will be entered to that effect.
*447 Plaintiff is likewise entitled to recover his active duty pay and allowances pursuant to the Uniform Retirement Date Act, 46 Stat. 253, from December 8, 1951 to December 31, 1951, and judgment will also be entered to that effect.
The exact amount of plaintiff’s recovery will be determined pursuant to Kule 38 (c) of the Rules of this court.
It is so ordered.
Durfee, Judge; MaddeN, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Currel Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States currently residing in Brooklyn, New York. He was born September 26, 1897.
2. Plaintiff was enrolled in the United States Naval Reserve Force on November 21, 1917, in the rating of yeoman second class, and thereafter served on active duty until December 3, 1918, when he was released from active service pursuant to his own request. Upon the expiration of plaintiff’s enlistment on November 20, 1921, he was honorably discharged.
3. Plaintiff enlisted in the United States Naval Reserve on December 26, 1942, as a chief boatswain’s mate and entered upon active duty February 21,1943.
4. On December 6,1944, a Board of Medical Survey found plaintiff to be unfit for service by reason of a diagnosis of arthritis, chronic, left ankle and subastragalar joint; not incurred in line of duty, having existed prior to enlistment; and not aggravated by service. In accordance with the rec-ommmendation of the Board, plaintiff was honorably discharged from the U.S. Naval Service on January 18, 1945.
5. On July 3, 1947, plaintiff was physically examined at the United States Naval Air Station, New York, New York to determine his eligibility for reenlistment in the United States Naval Reserve and was found “not physically quali *448 fied for reenlistment.” The report of physical examination summarized the defects as follows: “Defective vision— Overwt — Unstable blood pressure — History of Medical Survey;” plaintiff’s blood pressure having been recorded as varying “from 145/92 to 190/130”.
The record of 190/130 is unreliable. According to plaintiff’s testimony it was not the result of any examination made, but found its way into the record due to some mistake. This mistake is not explained by the defendant.
6. On August 4, 1947, plaintiff was examined and found physically qualified for reenlistment in the United States Naval Deserve. Plaintiff’s blood pressure was recorded as 160 systolic, 80 diastolic. He was thereupon ordered to active duty for a 2-week training period.
7. On November 3,1948, plaintiff was examined and found physically qualified for training duty in excess of 30 days; blood pressure having been recorded as 145 systolic, 95 diastolic. He served on active duty until June 29, 1949, when he was examined and found physically qualified for release from active training duty; blood pressure recorded as 148 systolic, 96 diastolic.
8. Plaintiff was examined on February 1,1951, and found physically qualified for training duty. He entered upon active training duty and served until February 17, 1951, when he was examined and found qualified for release from active training duty with the Naval Deserve.
9. On February 26,1951, plaintiff was examined and found qualified for extended active duty. His blood pressure was recorded as 138/76 sitting; 140/72 standing. Plaintiff reported to active duty on March 12,1951, and was honorably discharged on December 7, 1951, by reason of physical disability.
10. During the trial of this case, plaintiff testified that his disability occurred between March 12, 1951, the date of his entry on active duty, and August 7, 1951, the date of his examination for release from active duty status upon the termination of his enlistment.
11. From March 12,1951 to August 7,1951, plaintiff’s tour of duty consisted of the following:
*449 (a) March. 12-March 22: at home awaiting notification of assignment.
(b) March 22-April 1: standing gangway watches at the Brooklyn Naval Receiving Station examining incoming and outgoing packages.
(c) April 3-April 10: aboard a Patrol Craft Escort Rescue Boat (a boat about the size of a tugboat) docked at Portsmouth, New Hampshire.
(d) April 11-April 17: at sea aboard the Patrol Rescue boat on a training cruise from Portsmouth, New Hampshire to Norfolk, Virginia and return to Portsmouth; during this short tour of sea duty, plaintiff stood bridge watches and did some painting.
(e) April 18-August 7: Brooklyn Receiving Station where plaintiff performed light shore duty.
After the plaintiff had been received aboard the USS PCER 851, his daily routine required him to stand a watch from 4 a.m. to 8 a.m. Then during the day he chipped, painted ship, cleaned up, secured cargo aboard and performed general ship’s work from 8 a.m. to 4 p.m., and went on watch again from 4 p.m. to 8 p.m. Reconditioning the ship lasted about a week. Upon completion of reconditioning, the ship sailed to Boston, where a crew of trainees was picked up, and thence to Norfolk, Virginia. The sea was rough, and the plaintiff was desperately and continually seasick. He often hit his head in the companionways, and very frequently while standing watch he became sick and vomited in a bucket. On one occasion, the executive officer told him to go below, and the next morning at 8 a.m. the plaintiff was still asleep. The voyage from Boston to Norfolk took about 2y2 days each way, and the leg between Portsmouth and Boston took something less than a day each way.
When the plaintiff returned to Portsmouth he applied for a transfer to other duties and in a few days he was transferred to the Brooklyn Navy Yard. In going from the ship to the railroad station he experienced a physical reaction. Carrying a seabag and a suitcase, he walked about a block and a half. Although he had never before experienced any difficulty in carrying his kit, on this occasion he got “very winded and tired”. He could not make it to the railroad station, because of shortness of breath, difficulty in breathing, *450 and tiredness. Leaving his bags, he returned to the ship and was furnished transportation to the station. He had never before in his life felt that way.
12. Upon the expiration of plaintiff’s enlistment on August 7, 1951, he was given a physical examination which resulted in a diagnosis of “hypertensive cardiovascular disease, benign.” Plaintiff was thereupon transferred to St. Albans Naval Hospital for disposition and evaluation.
13. On September 10, 1951, plaintiff was examined by a Clinical Board convened at St. Albans Naval Hospital. The report of the Clinical Board stated as follows:
This 54 year old chief was recalled to active duty on 12 March 1951. On 7 August 1951 he was physically examined for release from active duty status and reenlistment and was found to have a persistent hypertension with a grade two hypertensive retinopathy and an electrocardiogram indicative of left heart strain. He was, therefore, admitted to the sick list at Third Naval District Headquarters, New York, N.Y., and immediately transferred here for evaluation and disposition.
Physical examination revealed the patient to be overweight, weighing 245 pounds, pulse 88, with u blood pressure recorded at 170/110 on the right arm and 170/120 on left arm. Silver wiring of the retinal arteries and arteriovenous nicking were noted. Crepitant rales were audible at both lung bases posteriorly. The heart was slightly enlarged to percussion. Circulation times revealed a decholin time of 30" and an ether time of 16". The venous pressure was 150 cm. of water. This evidence of early cardiac failure was compatible with the electrocardiogram which was definitely abnormal, revealing left heart strain. Chest X-rays revealed some calcification of the descending aorta and the incidental finding of hypertrophic arthritic spurs on the anterior margins of the bodies of the thoracic vertebrae. Kahn was negative. Urinalysis on one occasion did reveal a trace of albumin; phenolsulfonphthalein dye excretion test revealed only 49.6% excretion in two hours. Although an incidental urine revealed a specific gravity reported as 1.027, a Fishberg Concentration Test yielded a maximum concentration of 1.017. Urea nitrogen level was 17 mgm %. Total cholesterol — 270 mgm %, cholesterolesters — 177 mgm%. Complete blood count was normal..
A benodaine (benzodioxane) test was negative for any evidence of pheochromocytoma.
*451 On a 1,000 calorie, salt free diet and ammonium chloride therapy the patient has responded well. _ He is handicapped in that he develops dyspnea after climbing one flight of stairs or walking one quarter of a mile. Associated with occasional coughing he also notes a sensation of “blacking out”, really a tendency toward syncope, and occasional pain radiating down the left arm.
This patient, in summary has benign essential arterial hypertension with hypertensive cardiovascular disease (left heart strain and early congestive failure) associated with benign nephrosclerosis.
The present diagnosis is Hypertensive Cardiovascular Disease, Benign, #4930.
The Board recommends that he be ordered to appear before a Physical Evaluation Board.
His Physical Profile Number is: PTJLHES (411111).
14. Plaintiff appeared before a Physical Evaluation Board, convened at St. Albans Naval Hospital on September 18, 1951, consisting of three commissioned officers as members, two of whom were non-medical members, and one of whom was a medical member. The board, after deliberating on the evidence, made the following recommended findings:
(1) That Thomas Francis Hendrick, BMGC, V-6, TTSNR, #172 0012, be found unfit to perform the duties of his rate by reason of physical disability incurred while entitled to receive basic pay by reason of:
(2) diagnosis: Hypertensive Cardiovascular Disease, Benign; that
(3) his disability is not due to intentional misconduct or wilful neglect and was not incurred during a period of unauthorized absence; that
(4) his disability is considered to be the proximate result of the performance of active duty; that
(5) his disability is considered to be thirty (30%) per centum in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration, Code Numbers 7099; 7007 (Hypertensive Heart Disease); and that
(6) accepted medical principles indicate that his disability may be of a permanent nature.
The board advised the above-named individual that the recommended findings of the board did not indicate what the final determination of the Secretary of the Navy would be and that they were communicated to him only for the purpose of filing a rebuttal if he so desired.
*452 The above-named individual was then discharged from further attendance before the board.
15. Under date of September 27, 1951, plaintiff filed a statement in rebuttal to the findings of the Physical Evaluation Board that convened at St. Albans Hospital on September 18, 1951. Plaintiff stated therein that he was not in agreement as to the 30 percent recommended disability rating.
16. The Physical Review Council, under date of October 10, 1951, advised the Physical Evaluation Board as follows:
1. The members of the Physical Review Council concur in the recommended findings of the Physical Evaluation Board with the exception of that part of finding (1) which states that the subject member’s disability was incurred in receipt of basic pay, and finding (_4).
2. The past medical records in this case indicate that the member first presented abnormal blood pressure readings in 1947 as indicated on the report of physical examination, Form Y, submitted on 3 July 1947 incident to reenlistment in V-6, U.S. Naval Reserve. The history of illness as given by the patient at that time states that he believes that a mild hypertension was mentioned in connection with an earlier Medical Survey on 18 January 1945. His blood pressure readings reported in the 1947 Form Y are stated to have ranged from 145/92 to 190/130. Again in the physical examination report dated 3 November 1948 the blood pressure was found to be 145/95 and 148/95. The physical examination report (Standard Form 88) dated 29 June 1949 and submitted on release to inactive duty shows the blood pressure to have been 148/94 and 148/96.
3. The Physical Review Council is of the opinion that these facts refute the contention made by Hendrick in his statement before the Physical Evaluation Board that all diseases or disabilities that he now has have occurred between 12 March 1951 and 7 August 1951. It is noted that the member now presents persistent hypertension with a grade two hypertensive retinopathy, electrocardiogram indicative of left heart strain, evidence of early cardiac failure and benign nephrosclerosis. These are considered to reflect normal progression over a period dating at least from 1947 when he showed an elevation as high as 190/130, rather than changes developing over a five month period, as the member contends and the Physical Evaluation Board confirms in its present findings.
*453 4. In view of the above the enclosure is returned in accordance with the provisions of reference (a) for reconsideration and resubmission.
17. The Physical Evaluation Board reconvened on October 18, 1951, to reconsider its original recommended findings. The reconvened board consisted of three commissioned officers as members, two of whom had been members of the initial Physical Evaluation Board that considered the case on September 18, 1951, including the former medical member; a new non-medical member was present in lieu of one of the former non-medical members. The plaintiff appeared with counsel and the board reviewed the entire record, including a statement of Dr. Bernard Miller, dated October 16, 1951, wherein he stated as follows:
This is to certify that Thomas F. Hendrick of 6735 Bidge Blvd. BHyn, N.Y., was examined by me on 3 July 1947 at my office. He stated that he had been examined on this date, 3 July 1947 at Floyd Bennett Field, Bklyn, NY. for the purpose of enlisting in the Naval Beserve.
Blood pressure determinations on 3 July 1947 were: Bight arm 142/88, left arm 146/90.
18. After deliberating on the evidence, the senior member announced that the reconvened board had decided to make the following recommended findings:
(1) That Thomas Francis Hendrick, BMGC, U.S. Naval Beserve, 1720012, be found unfit to perform the duties of his rate by reason of physical disability incurred while not entitled to receive basic pay by reason of:
(2) diagnosis: Hypertensive Heart Disease; that
(3) his disability is not due to intentional misconduct or willful neglect and was not incurred during a period of unauthorized absence; that
(4) his disability is considered not to be the proximate result of the performance of active duty; that
(5) his disability is considered to be not ratable in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration, Code Numbers 7099; 7007, because of the instructions contained in paragraph 5 (b), Part II, Begulations and Instructions implementing Title IV, Public Law 351, 81st Congress (Career Compensation Act of 1949); and that
*454 (6) accepted medical principles indicate that his disability may be of a permanent nature. _
_ The board advised the above-named individual that the recommended findings of the board did not indicate what the final determination of the Secretary of the Navy would be and that they were communicated to him only for the purpose of filing a rebuttal if he so desired.
The above-named individual and his counsel were then discharged from further attendance before the board.
19. A minority report was submitted by one of the non-medical members of the reconvened Physical Evaluation Board which stated as follows:
This member of the Board is of the opinion that the evaluee’s physical disability was service incurred in line of duty.
20. The Physical Review Council concurred in the recommended findings contained in the majority decision of the reconvened Physical Evaluation Board, and on November 6, 1951, the Secretary of the Navy approved the proceedings and directed that plaintiff be discharged from the naval service by reason of physical disability. He was accordingly given an honorable physical disability discharge on December 7, 1951.
21. Pursuant to plaintiff’s application filed with the Board for Correction of Naval Records, the Bureau of Medicine and Surgery was requested to furnish the board an advisory opinion. Under date of July 28, 1955, the Bureau of Medicine and Surgery advised the Correction Board as follows:
2. A review of the medical record indicates that when Hendrick was examined on 3 July 1947, his blood pressure was reported to be 190-142 systolic and 130-92 diastolic. On 4 August 1947, it was again reported that his blood pressure was in the hypertensive range with a reading of 160/90. On 3 November 1948, and again on 29 June 1929 [sic] it was reported that his blood pressure was in the hypertensive range. On the former date his systolic was 145, diastolic 95; and on the latter date, systolic 148 and diastolic 96.
3. Based upon the foregoing, there appears to be little doubt that Hendrick was suffering from arterial *455 bypsrtension prior to his assignment to extended active naval service on 12 March 1951. After careful review of his record, it would be entirely proper, medically, to consider that the hypertensive cardiovascular changes which he showed on 7 December 1951, the date he was discharged from the Naval Eeserve, were due to the natural progress of the hypertensive vascular disease present prior to assignment to active duty. In view of the foregoing therefore, the determination of the Secretary of the Navy that Hendrick’s disability was not incurred while entitled to receive basic pay appears to have been in accord with the evidence of record and sound medical judgment.
22. On October 17,1955, the Board for Correction of Naval Eecords held a formal hearing with plaintiff and his counsel in attendance. The board, in its decision dated April 5, 1956, advised the Secretary of the Navy that no change, correction or modification of plaintiff’s naval records was warranted. This decision was approved by the Secretary of the Navy on April 11,1956, and plaintiff was so advised.
23. As a result of plaintiff’s request for reconsideration, a further review of the matter was held by the Board for Correction of Naval Eecords on August 5, 1957, at which time plaintiff again appeared before the board with counsel. Plaintiff testified before the Correction Board in part as follows:
ME. CAELSON [Board Member] : I would like to ask. one or two questions if I may. When did you first notice the effects while you were in the service?
ME. HENDEICK. The effects of what, Mr. Carlson?
ME. CAELSON: This physical condition.
ME. HENDEICK: I never knew I had it until my term of enlistment was up on August 7,1951, and I was stationed at the Brooklyn Navy Yard and 90 Church Street called me and said: Do you want to reenlist or do you want to get out? And I said. I want to ship out or reenlist. And they said: Be over here — they said: Be over here tomorrow morning between nine and ten, and we’ll process you. So I went over and signed various papers, took the oath, and I was told to go to sick bay. The doctor in sick bay said: I don’t like the condition of your heart. Have you ever had any trouble with it ? And I said: No, sir. Have you ever taken any medication for it ? And I said: No, sir. Do you ever get tired ? *456 No, sir. (doctor) Ever get dizzy spells? (Mr. Hen-drick) No, sir.
24. The Board for Correction of Naval Records, under date of August 16,1957, advised the Secretary of the Navy as follows i
1. Pursuant to the provisions of reference (a), subject former enlisted man, hereinafter referred to as Petitioner, submitted written application to this Board requesting a review of his naval record, and in particular, that his record be corrected to show that he was retired for physical disability on 7 December 1951 rather than honorably discharged for the same reason.
__ S. A review of Petitioner’s naval record was held on 17 October 1955 at which time he appeared before the Board with a representative of the American Legion. On 11 April 1956 the Assistant Secretary of the Navy (Personnel and Reserve Forces) approved the decision of the Board that no correction is warranted. Subsequent thereto Petitioner filed formal request for reconsideration and this was approved by the Assistant Secretary of the Navy on 81 May 1957. Further review 'of th% Blatter was hold on 5 August 1957 at which time petitioner appeared before the Board with counsel, Mr. Guy Emery, Attorney at Law, Washington, D.C. Documentary material considered by the Board consisted of the original application, the request for reconsideration, related correspondence, Petitioner’s naval records and applicable statutes, regulations and policies. Deliberations in the matter were concluded on 12 August 1957.
S. The Board, having reviewed all of the facts of record pertaining to Petitioner’s allegation of error, finds as follows:
(a) That Petitioner was bom 26 September 1897 at Jersey City, New Jersey; that he was enrolled in the United States Naval Reserve Force on 21 November 1917 in the rating of Yeoman, second class; that on 3 December 1918 he was released from active duty and honorably discharged on 20 November 1921: that on 26 December 1942 Petitioner enlisted in the United States Naval Reserve as Chief Boatswain’s Mate (acting appointment) to serve two years; that he was honorably discharged by reason of medical survey (arthritis) on 18 January 1945, having served on active duty from 21 February 1943; that on 4 August 1947 Petitioner again enlisted in the United States ifaval Reserve to serve *457 a period of four years; that subsequent thereto he served on active training duty on several occasions including a period from on or about 1 November 1948 through 27 June 1949; and that he reported for active duty, pursuant to official orders, on or about 12 March 1951, and continued to serve in that capacity until 7 December 1951 at which time he was honorably discharged by reason of physical disability (hypertensive heart disease).
(b) That on 10 September 1951 Petitioner was examined by a clinical board and diagnosis of “Hypertensive Cardiovascular Disease, Benign #4930” was established; that on 18 September 1951 he appeared before a physical evaluation board which found him unfit to perform his duties by reason of physical disability incurred while entitled to receive basic pay; that the disability was rated and considered to be thirty percentum in accordance with the Standard Veterans Administration rating schedule; that it was considered to be the proximate result of the performance of active duty and of a permanent nature; that the Physical Beview Council concurred in the findings except that part which states that the disability was incurred while in receipt of basic pay and that it was the proximate result of the performance of active duty; that on 18 October 1951 the Physical Evaluation Board reconvened to reconsider and it was found that the disability was incurred while not entitled to receive basic pay; that it was not the proximate result of the performance of active duty, and was not considered to be ratable; that a minority report was filed by one of the three members which was to the effect that the disability was service incurred in line of duty; that the Physical Beview Council recommended approval of the majority decision and on 6 November 1951 the Secretary of the Navy approved the proceedings and findings and directed that Petitioner be discharged from the naval service by reason of physical disability; 'and that he was discharged on 7 December 1951.
(c) That thereafter Petitioner filed application with this Board requesting physical disability retirement and on 13 July 1954 was advised that his disability was not incurred while entitled to basic pay; that this determination was based oh an opinion of the Judge Advocate General that persons who suffered disabilities during periods of service prior to 1 October 1949 and whose disabilities were not aggravated by service subsequent to that date did not incur their disability while entitled to receive basic pay and that since the heart *458 condition had its inception in 1945 there was no basis for relief.
(d) That on 4 May 1955 the American Legion requested that the case be reopened with a view to according a hearing in the matter; that on 23 May 1955 the case was forwarded to the Chief, Bureau of Medicine and Surgery, with request for opinion as to whether Petitioner was incapacitated on orprior to 7 December 1951 within the meaning of the Career Compensation Act of 1949; and that a reply, dated 28 July 1955, reads, in pertinent part, as follows: _
_ “2. A review of the medical record indicates that when Hendrick was examined on 3 July 1947, his blood pressure was reported to be 190-142 systolic and ISO-92 diastolic. On 4 August 1947, it was again reported that his blood pressure was in the hypertensive range with a reading of 160/90. On 3 November 1948, and again on 29 June 1949, it was reported that his blood pressure was in the hypertensive range. On the former date his systolic was 145, diastolic 95; and on the latter date, systolic 148 and diastolic 96.
“3. Based upon the foregoing, there appears to be little doubt that Hendrick was' suffering from arterial hypertension prior to his assignment to extended active naval service on 12 March 1951. After careful review of his record, it would be entirely proper, medically, to consider that the hypertensive cardiovascular changes which he showed on 7 December 1951, the date he was discharged from the Naval Reserve, were due to the natural progress of the hypertensive vascular disease present prior to assignment to active duty. In view of the foregoing therefore, the determination of the Secretary of the Navy that Hendrick’s disability was not incurred while entitled to receive basic pay appears to have been in accord with the evidence of record and sound medical judgment.”
(e) That a hearing in the matter was held on 17 October 1955 at which time Petitioner appeared in person with Mr. C. N. Florence of the American Legion and additional evidence and argument was presented; that subsequent thereto the Board requested further medical advice based on the additional evidence and argument; that in memorandum dated 19 March 1956 the Chief, Bureau of Medicine and Surgery, stated as follows:
“2. Petitioner’s testimony presented on 17 October 1955 has been examined.
“3. A review of petitioner’s medical records reveals original signed reports of physical examination dated *459 3 July 1947, 3 November 1948 and 29 June 1949, which, indicate that petitioner was suffering from arterial hypertension prior to his assignment to extended active naval service on 12 March 1951.
“4. In view of a history of arterial hypertension prior to 12 March 1951, this Bureau continues in the opinion that petitioner’s disability, hypertensive cardiovascular disease was not incurred while he was entitled to receive basic pay.”
(f) That the Board on 2 April' 1956, found that the evidence presented was not sufficient to overcome the presumption of correctness which attaches to the record; the Board found that the proceedings leading to Petitioner’s discharge appeared to be proper and legal and that it did not appear that Petitioner’s disability was incurred during a period of service during which he was entitled to receive basic pay; and that the Assistant Secretary of the Navy (Personnel and Reserve Forces) approved the Board’s decision that no change, correction or modification was warranted.
(g) That on 8 February 1957 Petitioner filed request for reconsideration contending that his record should be corrected to show that he was placed on the temporary physical disability retired list for five years following his discharge and then transferred to the permanent retired list; and that the basis for this contention is an opinion of the Comptroller General of the United States (35 Comp. Gen. 626-630, dated 7 May 1956, which reads in pertinent part as follows:
“There is no requirement, express or implicit, that such benefits [of Title IV of the Career Compensation Act of 1949] shall accrue only in the cases of those members of the uniformed services having an uninterrupted period of military service between the date the disability is ‘incurred’ and the date the Secretary determine [sj that the member is unfit to perform his military duties. The reasonable intendment would appear to be that the prescribed benefits should accrue to individuals whose status otherwise brings them within the scope of subsection (a) or (b) [of section 402, Career Compensation Act of 1949], without regard to any intervening breaks in their active service with pay. The introduction of a requirement of uninterrupted military service would impose a condition not found in the language or appearing to be within the intent of the statute.”
(h) That in a memorandum of this Board, dated 11 April 1957, the Judge Advocate General advised that if Petitioner was denied relief for the opinion cited in the *460 “no merit” leter of 13 July 1954 “* * * and if the Board now sees some period of service prior to 1 October 1949 during which this disability existed, a reconsideration would seem proper.”; that the Judge Advocate General also indicated that the Comptroller General’s opinion of 7 May 1956 reflects the law in such cases; and that upon recommendation of the Board the Assistant Secretary of the Navy, on 31 May 1957, approved further proceedings in the case.
(i) That counsel for Petitioner has presented a brief in support of the application in which he restates the facts of the case, presents extracts from “A Textbook of Medicine,” 8th edition, by Cecil and Loeb, as aid in understanding the nature of the disability, and the following written argument:
“The applicant has consistently contended that he incurred his disability during his last period of service as was determined in his initial hearing before a Physical Evaluation Board. The only evidence of a substantial nature to refute this contention is the examination report of 1947 at NAS, Floyd Bennett Field. Unless much weight is given this report, the record is otherwise devoid of evidence sufficient to overcome the strong presumption of soundness arising upon Hendrick’s recall in March, 1951. Hendrick was without prior symptoms indicative of the disease process. His recorded blood pressure readings, except for this particular examination, were not abnormally high for a man of his age. Further, it does not appear that accepted medical principles would establish the incurrence of his disability prior to his last period of active duty (CF, SYNOP 3.18.2,29 Aug 55).
_ “Regardless of the foregoing, it is obvious that considerable weight has been attached to the 1947 Floyd Bennett Field examination report. If given full value, this report suggests that Hendrick was then and also during the latter part of his World War II service suffering from hypertensive disease. It appears implicit from the record that this view is the one that has been relied upon by the various Navy agencies in denying Hendrick the benefits of Title IV of the Career Compensation Act of 1949. So far as the VA determination of service connection is concerned, the record does not reflect whether that connection is attributed to the petitioner’s term of service commencing in 1942 or that upon which he entered in 1951.
“However, notwithstanding the former posture of the case impressed upon it by earlier and erroneous con- *461 struetions of tbe law (i.e. those evoked during prior hearings before the Physical Evaluation Board, etc.) the plain fact is that the petitioner can now prevail upon either of the above theories. It was held by the Comptroller General of the United States, 35 Comp. Gen. 626, 630, (B-126506, May 7, 1956) that:
“ ‘There is no requirement express or implicit, that such benefits [of Title IY of the Career Compensation Act of 1949] shall accrue only in the cases of those members of the uniformed services having an uninterrupted period of military service between the date the disability is “incurred” and the date the Secretary determiners] that the member is unfit to perform his military duties. The reasonable intendment would appear to be that the prescribed benefits should accrue to individuals whose status otherwise brings them within the scope of subsection (a) or (b) [of section 402, Career Compensation Act of 1949] without regard to any intervening breaks in their active service with pay. The introduction of a requirement of uninterrupted military service would impose a condition not found in the language or appearing to be within the intent of the statute.’
“The foregoing view was adopted by the Judge Advocate General of the Navy in his opinion (JAG: III:7:PLA;hl) of July 6, 1956. Prior opinions, insofar as they are inconsistent, were overruled.
“The fact that Hendrick was separated from the Naval Service in 1945 by medical discharge may give rise to some uncertainty in view of the language of the JAG opinion. However, aside from the circumstance that there was no Secretarial determination of his unfitness in 1945, it is manifest that his prior separation was by reason of his left ankle disability, which obviously was not the cause of his unfitness as determined in 1951. It is not logical that he should now be disallowed disability retirement pay for his Hypertensive Heart Disease because of a prior action dealing with only his ankle disability. Certainly no rights were ‘accrued’ in this respect. In connection with his ankle disability, Hendrick will not be permitted to receive compensation from the Veterans Administration for that alone and at the same time disability retirement pay from the Navy for his Hypertensive Heart Disease. Thus, it would be manifestly unfair and inequitable not presently to rate Hendrick for both his Hypertensive Heart Disease and his ankle disability.
“It will be noted that the application requests that Hendrick be placed upon the Temporary Disability Retired List for five years to be followed by permanent *462 retirement for physical disability. If five years is considered too long, it is requested that the Board find another date for permanent retirement which it thinks fair. Individuals on the Temporary Disability Retired List are examined once every 18 months. They are referred to a Physical Evaluation Board for reevaluation only when their condition has stabilized to the extent it will probably not change further in degree or just prior to their fifth year of temporary disability retirement. Then, if the Physical Evaluation Board so recommends and the recommendation is approved, the individuals may be permanently retired. With a disease of a progressive nature such as that suffered by Hendrick, it is doubtful that he would have been ordered before a Physical Evaluation Board until at least his second and probably not until his third periodic physical examination. In the event it would take place after his third such examination, it is quite possible that he would have not been permanently retired until the fifth anniversary of the placement of his name on the Temporary Disability Retired List.”
That he then suggests that the Board correct the record to show that Petitioner was placed on the temporary disability retired list for five years following his discharge (at 40%), or for a lesser period if the Board so finds, and then transferred to the permanent disability retired list at 40%. (It is noted in the brief that Petitioner was rated 40% disabled by the Veterans Administration).
(j) That the Veterans Administration advised the Board that Petitioner was granted service connected disability Compensation, traumatic arthritis, left ankle resulting in limitation of motion, ten percentum, from 19 July 1938; that the claim was rerated again on 31 July 1952, based on Korean service and a twenty percentum disability evaluation from 8 December 1951 was assigned to a disability diagnosed as hypertensive vascular disease, moderate, diastolic 112; that the ten percentum disability evaluation for the left ankle was continued; and that the combined rating was thirty-percentum from 8 December 1951. (At present the combined disability evaluation is forty percentum).
(k) That the best medical advice indicates that this Petitionei*’s hypertensive heart disease was not incurred while he was entitled to receive basic pay; that there is to be found in the record no period of active duty during which such disease had its inception; that the proceedings leading to Petitioner’s discharge, on *463 7 December 1951, by reason of physical disability, were legal and proper; and that the resultant honorable discharge was appropriate under the law in effect at that time and at the present.
(l) That it does not appear that the hypertensive heart disease had its inception or was incurred during any period of active training duty nor was Petitioner injured during any such period to a degree that could be considered to be disabling within contemplation of the retirement laws in effect at the time.
(m) That the evidence and argument presented by Petitioner, or on his behalf, is not of a nature such as can be considered sufficient to overcome the presumption of correctness which attaches to records of the Department of the Navy; and that the Board, in making this finding is mindful of the presumption of fitness which surrounds physical examinations accorded members of the service upon recall to active duty.
(n) That in view of the foregoing findings this Board further finds the existence of no error or injustice, in this case, which requires corrective action. The Board finds that Petitioner’s disability of hypertensive heart disease was not incurred during a period of active duty service when he was entitled to and in receipt of basic Siy; that the proceedings leading to his discharge on 7 ecember 1951 were legal and proper; and that the discharge is appropriate in every way.
DECISION:
It is the decision of this Board that no change, correction or modification of the naval record of former Chief Boatswain’s Mate (Shipboard Boatswain’s Mate), Thomas Francis heNdrick, United States Naval Reserve, 1720012, is warranted.
4. It is certified that a quorum was present at the time of the Board’s review of subject case and at the time of its deliberations, and that the foregoing is a true and complete record of the Board’s proceedings in the above entitled matter.
5. The foregoing action of the Board is submitted for your review and action..
Under date of September 17,1957, plaintiff was advised that the Secretary of the Navy had reviewed the proceedings of the Board and approved the Board’s final decision in the case.
25, Prior to plaintiff’s assignment to active naval service on March 12, 1951, he was employed as a checker on the New York waterfront. Following his discharge from the *464 Navy on. December 7, 1951, plaintiff returned to this work and at the time of the trial of this case was so employed as a checker on the New York waterfront.
26. Plaintiff called as his witness Dr. Charles E. L. Halley. Dr. Halley had conducted a thorough physical examination of plaintiff on January 30, 1959, and testified at length as to the results of such examination.
In reply to a request for his findings he testified as follows:
The diagnosis was premature senescence, senile kera-toses and warts, some plantar callosities, onychogry-phosis of each great toe nail. In other words, a partly deformed great toe. Cataracts, bilateral, oral sepsis, degenerative joint disease, a hemorrhoidal tag, diverticu-losis of the sigmoid. There was a surgical absence of the thyroid, the prostate, and the left testis.
And then of secondary and more importance I found an emphysema of the lungs and the chest. It had been noted previously which I found also on examination that there was an adhesion of the left costophrenic angle.
And then of major importance there was a series of findings, best grouped under cardio-vascular and renal disease which, incidentally, is a rather poor term but it is the best one we have to summarize extensive changes. There was definitely a thickening of the arteries, arteriosclerosis which was generalized, with retinal changes, pretty surely cerebral, which is certainly renal, which is the most important with evidence of coronary artery changes.
A definite hypertension, particularly diastolic hypertension with a narrow pulse pressure. Enlargement of the heart, abnormal electrocardiograms. There was a flutter fibrillation. There is evidence of nephrosclerosis, in other words, renal changes which is evidenced by albumin casts in the urine, plus other findings and pretty surely peripheral vascular disease although I could not go further on the evidence I had. There is a change in the. blood pressure in the lower part of the abdomen which seems to extend down into the lower leg. There also is arteriosclerosis obliterans, which in other words is progressive narrowing of the major arteries.
From that history and other data a previous diagnosis of diabetes is indicated although at the moment I could not make it on my own findings. There had been at least, one previous bout of congestive heart failure, a previous diagnosis of pyelonephritis in 1950 and a previous indication of atrial flutter with conversion to sino- *465 atrial rhythm in 1957. Perhaps I should add that the previous bout of congestive heart failure or the previous episode of atrial flutter would fit with heart disease of the coronary artery.
On the single blood counts I had available the hemoglobin was quite high, 18.00 or 116% with a cell pack of 57 so that the diagnosis of polycythemia is scarely warranted on the evidence that I had. That in brief is the condition in which there 'are too many red blood cells in the body.
27. Later plaintiff’s counsel propounded to Dr. Halley a hypothetical question based on the plaintiff’s history as set out in the record, and asked Dr. Halley’s opinion as to the cardiovascular diseases suffered by plaintiff as of December 1951. The witness replied as follows:
I would conclude that this man had arteriosclerosis involving particularly the coronary artery and the renal vessels, so-called coronary artery disease, with definite impairment of cardiac function as manifested by the shortness of breath, the pain radiating down the left arm particularly.
There would be a question because of the relatively sudden onset after the end of that voyage of the shortness of breath in walking a few blocks whether or not he might have had a myocardial infarction so that we have this little evidence of that, but we have seen patients who do not have pain but on examination have difficulty. There is certainly impairment of cardiac function as judged by the increased circulation times of the decholin and the ether and the elevated venous pressure. The calcification of the descending aorta would not be unusual. The urinalysis revealed the albumin and the Fishberg showed a concentration of 1.017. Phenolsulf onphthalein dye excretion test showed some impairment of renal function.
The urea nitorgen level is in the upper level of normal.
I would conclude that on the basis of the information available here that this man had an arteriosclerosis, coronary and renal with definite changes as manifested by the various laboratory examinations.
I would have to disagree with the note on benign essential arterial hypertension because we don’t use the term benign when there are definite findings of this sort.
Q. "What do you understand the term benign to mean, Dr. Halley?
*466 A. It would be essentially a patient whose blood pressure, particularly the systolic and sometimes even the diastolic and not infrequently both are somewhat above the and sometimes considerably above the usually accepted norms or averages and on complete examination no significant abnormalities are found. We have here the eyegrounds and the electrocardiogram studies and so forth, although I think the high percentage of those patients will develop changes.
Q. These diseases which in your opinion the patient suffered in December of 1951, are they progressive or in a static condition ?
A. They may be static for long periods, but generally progressive rapidly or slowly.
Q,. Are they curable or not ?
A. No. They may be helped with therapy, hut curable, no.
Q. In forming the opinion which you have formed, what significance have you given to the reported blood pressure of 190 over 130 as of July 3,1947 ?
A. That recorded blood pressure I would disregard completely for several reasons.
One, essentially all pressures over the years prior to that particular pressure were within normal or average limits.
Secondly, on the same day we have a report and we have no reason to doubt it that pressure taken by a civilian doctor again was within average of normal limits.
Finally, that over a number of years after that, various blood pressures taken and reported were within normal or average limits. Certainly for a period of about four years.
Q. You say the pressures were within normal limits and the pressures as stated in the hypothetical question were 142 over 88 in the right arm and 146 over 90 in the left arm and it is your opinion that that reading was within normal limits?
A. For a man at fifty years of age and his body size and arm size, certainly within average or normal limits.
28. The crucial question was then propounded to the witness as follows:
Do you have an opinion as to what date the cardiovascular disease and the conditions were incurred that you have mentioned?
A. That is impossible to answer in a sense, and not to be facetious, but our arteries begin to age the day *467 we are bom, but certainly as outlined here the changes seem not to have been active. Rather, the time is not definite — probably the late spring or early summer of 1951, and I would say as noted here at the completion of the voyage which was of three months’ duration he was exhausted after he walked a few blocks to the railroad station, was short of breath and had to set his bag down frequently to catch his breath, that is about the first definite point that we have.
I suspect that had some of these very fine laboratory examinations been made in the months prior to this that there would have been some deviations but there were certainly no indications on the information we have to do these tests prior to this particular time.
Q. As a specialist in cardio-vascular diseases, what meaning do you attach to the statement that the blood pressure vanes from 145 over 92 to 190 over 130?
A. If we were to use that in reports, records of patients’ reports, it would mean that a great many, certainly a large number of determinations of blood pressure had been made, ten, twelve, fifteen, twenty or thirty or forty with a range in quite a number of blood pressure determinations 135 over 92 to 190 over 130. We would not use that if only two determinations had been made with such a wide variation between the two measures because it gives an entirely false impression of what the blood pressure really is.
On cross-examination questions and answers appear as follows:
Q. And was it your testimony, Doctor, on direct examination, that all these changes that are disclosed in the examination of August 1951 in your opinion occurred between March and August of 1951?
A. The findings were August 1951 — and definitely without any question from the records and from the records which are all that I have to go by prior to that date, the examinations were not remarkable, within normal limits, or nothing significant. I have got to assume and take the records as such, that there were no findings, and you can put this remark off-the-record if you want, that that was done so poorly or by an inexperienced person.
Q. Do you feel that a man could have developed this condition in less than five months ?
A. It could happen, yes.
Q. Is there a possibility that it could have been changes developed over a lengthy period ?
*468 A. I don’t think there is any question about that because no matter what this patient showed as of August of 1951 it could not have developed novo, completely within a short period of time.
Q. Within five months?
A. With antecedent changes, yes, because at his age there would have been slow, progressive changes in the blood vessels. That is the usual, the normal thing to happen.
Q. Is it possible that it could have been due to the natural progress of the hypertensive vascular disease over a long period ?
A. I am not clear on that question. You mean his condition as of August 1951 ?
Q. Yes.
A. It could be and unquestionably is the result of progressive changes of aging.
Q. Over a period of time?
A. Yes.
Q. You are speaking of a period of years and not five months?
A. Well, it would be a lifetime in essence, yes, more rapidly as the years progress.
Q. Is it possible that it could be considered as a normal progression over a half dozen years ?
A. You mean by that the condition as of August 1951 ?
Q. Yes.
A. Normal evolution over a period of years ?
Q. Yes.
A. Yes, that would be possible.
Q. In five years, for instance?
A. It could be, yes.
On redirect examination Dr. Halley was asked whether plaintiff’s condition, as shown in December 1951, represented an aggravation due to his navy service.
A. Certainly in the interval between February 26, 1951 when he was examined and found physically fit for extended active duty and then with the blood pressures that were perfectly normal, namely 138 over 76 sitting and 140 over 78 standing, the heart and vascular system were normal.
Between that date and the hospitalization there is a statement that he had been exhausted and had been short of breath and did shore duty until August 4,1951, when a physical examination to determine his fitness and so on was made and a diagnosis of hypertensive cardiovascular heart disease was made. The electrocardio- *469 Sram showed left sided myocardial strain of moderate egree, and his blood pressure was 180 over 140 and the ophthalmoscopic examination showed arterial silver wiring effect with moderate A. V. nicking. The heart sounds were clear, there were no murmurs or irregularity, and the heart was slightly enlarged to percussion.
Certainly something happened in that interval and the duty on that particidar voyage sounds rather strenuous, namely, he suffered repeated seasickness, stood watch from four a.m. to eight a.m. and then until four o’clock various other work about the ship and then stood watch again until eight p.m.
At the end of the voyage there is noted exhaustion, certainly a break in ms physical condition in that interval.
It is impossible to say and I would feel that it was not fortuitous — probably I think as a trigger mechanism to the duties and the work on that particular voyage at that particular time.
Q. Would it be your opinion, Doctor, that on the basis of the facts as they have been put to you that the progress of his condition between December, between March and December was other than a normal progress?
A. I don’t think there is any question about it, taking the report of the physical examination prior, when he was considered fit for duty which, from the record, was perfectly within normal limits. He was judged for active duty and then we find marked changes without any question at the end of a few months’ time, namely, at the end of this hospitalization. The record there literally speaks for itself.
29. The witness, Dr. Halley, seems to base his opinion that plaintiff’s disability came to a head between March and August 1951, upon the fact that the examination he received from the Navy doctors prior to his last period of active duty, fails to disclose any such disability. In other words, since defendant’s doctors found plaintiff sound in March of 1951, his subsequently appearing disability must be held to have developed thereafter.
30. In males age 40 to 60, the mean systolic readings range from 129 to 137, with a low normal of 109 and a high normal of 161. For such age group, the mean diastolic readings range from 81 to 84, with a low normal of 69 and a high] normal of 98. An obese individual normally shows somewhat higher readings than the average for that person.
*470 CONCLTTSIOH OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover retirement pay under section 402(a) of the Career Compensation Act of 1949, supra, for the period commencing January 1,1952, to date of judgment, and judgment will be entered to that effect, with the amount of recovery to be determined pursuant to Rule 38 (c).
The court further concludes that plaintiff is entitled to recover active duty pay and allowances for the period December 8, 1951 to December 31, 1951, and judgment will be entered to that effect, with the amount of recovery to be determined pursuant to Rule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on February 10, 1961, that judgment for plaintiff be entered for $2,914.16.